Reversed and remanded, three words that apparently can cause as much trouble as I'll do it, I love you, and I'll have dessert. We've cited numerous cases that are appropriately entitled twos and threes in the lineage of those cases. For instance, in Brown v. Baden, there was a case in which a judge had to be reassigned in that case. That did not happen. Lindy had three different cases. And since court of appeal judges are wordsmiths, your careers are in communication, you say what you mean. And in Lindy 1, you said, we affirm, we reverse, and we send back for further proceedings. Reversed and remanded. The judge seems to have not viewed this really as a limited remand, I guess. And was it? I mean, what? Our position is that it was a limited remand. Is there a do we have you found any cases that had anything like this? Well, certainly T.M. 1 is a case which says specifically what this Court wanted. We conclude that the conditions 4 and 6 through 13, the sex offender conditions of supervised release, are invalid. Because they're not reasonably related. And then you go on to go ahead and say, we send back, however, for further proceedings or for further consideration condition 3 and condition 14. But nothing about what we would call the sex offender conditions. Well, even if there were some room for reconsideration there, what was the showing on remand which might have permitted the trial judge to reconsider those provisions? In the light of new information, let's say. We don't think that there's any new information. There were certainly a lot of documents which were presented to the Court. And there was testimony. Testimony from Dr. Stephen Gray, who did an evaluation back in 1999. And from T.M.'s counselor, Thomas Romero. But basically what their testimony contained in their reports and their records. There wasn't anything new. If there was anything new, I would say that with regard to Dr. Gray's report, if the Court will recall, Dr. Gray had ordered a polygraph, which was done by his wife, who he's in practice with. And because Mr. Minnick moved his hand, it didn't take. It was considered an invalid polygraph. And so he commented in his evaluation, he thought it would be important that a valid polygraph be considered. There was one that was eventually done. And Mr. Minnick passed it by answering truthfully that he had not fantasized and had not had any sexual contact with children in the previous 20 years. When Mr. Gray, Dr. Gray was asked about that in the hearing, he had not considered it before his testimony. And it supported what his previous conclusions were. And that was that Mr. Minnick was a medium to low risk to reoffend. Another matter which was not before the Court previously was the plethysmograph. And the plethysmograph which was conducted by Dr. Gray came to essentially the same conclusion, that Minnick was again a medium to a low risk. And so while there was some new information, it's not the the Court in your previous opinion said the information that we have without more, which we think is what the Court interpreted as its license to go ahead and take more information. But that had been done before the last appeal. And that's correct. Is that also true of the second polygraph? I believe that it is. The second polygraph was before this Court and the district court previously. But Dr. Gray had not had the opportunity to review it. So there wasn't anything more. There wasn't any evidence that there had been a new offense. There wasn't anything that showed TM had lied to his probation officer or lied substantively to his counselors about having contact with children, sexual interest in children and so on like that. That we feel is the something more that this Court has been after. The district court dropped a footnote I think saying that close inspection of the record reveals that in his polygraph he said that he hadn't fantasized about relations with young girls for the past three years, not the past ten or twenty. Do you know the footnote I'm talking about? I know the footnote that you're talking about. And we feel that that was a misunderstanding. We hoped we had clarified it before. And the misunderstanding was this. When the polygraph questions were initially asked, there was some concern that TM was not answering truthfully. And it turned out it was the wording of the question with regard to have you had any sexual contact with children without limiting the amount of time involved in the previous three years except that's when the polygraph was. And so the district court we think had misinterpreted the fact that the polygraph was in the previous three years, but he answered questionably because the question had not been limited in time to make it post the 1981 conviction and events, that that's where the  three years and wrote it down to the previous 20 years so that it was post the 1981 offense, then the polygraph conclusion was that the response was truthful. I think that what the district court misunderstood was simply that the polygraph itself had happened within the previous years. The way I understood that footnote, it was that, yes, he'd been truthful in saying that he had not had any contact with minors in the last 20 years, but all he was asked regarding fantasizing about it was the last three years. Correct. But again, you're saying that's wrong. Our reading of the polygraph report is that once the scope was narrowed to include the previous three years by just generalized asking of 20 years, that the response was truthful, that he had not fantasized and had not had contact. It's not unlike the Matthews case, because Matthews, as does Caterino, says that the district court on remand can go ahead and present evidence on matters that may be relevant to the sentence. And Matthews goes on to narrow that and saying there are exceptions to that. We can limit evidence if, for instance, there's been a governmental deception and obstruction or some kind of inappropriate conduct by the government, none of which we are suggesting even happened here. Or if the other side has had the full and fair opportunity to go ahead and present evidence. What happened the first time in the disposition hearing was that the government was not the government agreed essentially with the defense that there should not be sex offender conditions. The government had the opportunity the first time the disposition came around to go ahead and present whatever evidence it thought was necessary to address the issue of sex offender conditions. And certainly the district court has the power in and of itself to go ahead and order records and disclosure to help flesh out the questions it has. In fact, the district court in this case before the disposition hearing on the second probation revocation did exactly that. It was the district court that ordered that the psychosexual evaluation even happen. And so not only did the government have a full and fair opportunity previously to go ahead and present whatever evidence it felt was important for imposing sex offender conditions, but the district court also had that opportunity. Because of that, the case, this Kano case, says you don't get to re-litigate that. You don't get to re-litigate any of this. Because your mandate so narrowed what the focus of the district court should have been. Was there a motion to reimpose these conditions coming from the government? What's the genesis of their being reinstituted? What happened is after the mandate issued, the district court set the matter for sentencing. Then the district court continued the sentencing. Then the district court continued a hearing, but set it for what was a status conference and not a redisposition hearing. And about that time, the court issued an order saying it expected to parties to address certain questions and to answer certain points of law. For instance, there were questions that the district court had to address whether or not TM was a truthful reporter, whether or not he knew that Hertlicka was a convicted sex offender. And there were three other questions it directed both parties to be prepared to address before redisposition happened. It also wanted the parties to go ahead and address both the Scott case and I believe it's the Kelly case, the ones that the court relied on in TM1, to go ahead and impose its decision. And it wanted a briefing on that matter as well. We attempted to get the court to clarify that it felt it indeed could go ahead and take new evidence, new information and new argument on those issues in light of what this court's mandate was. And essentially, that's what happened. And so we set the matter for evidentiary hearings to allow the government to go ahead and present the witnesses that it had, which it did do. And throughout that presentation, nothing new came forward. Do you want to say anything about, there are a couple of other side issues, the denial of credit for the limited release. Do you want to say anything about that? I would like to say that. We think that the case law is pretty clear, all the way from the United States Supreme Court in the Johnson case, as well as in the Baresi case out of the Second Circuit. The statute says that supervised release begins when someone is released from prison. The imprisonment portion of TM's sentence, the 24 months, was not touched by this court. It was not changed by the district court, except as may apply to the 128, 180 days which were supposed to be the home confinement. But the 24 months that he actually was in prison was not changed by anyone. And he was released from that in September. And while initially the quote-unquote sex offender conditions were not imposed, we clarified, I think it was in the September hearing, that indeed he was on supervised release. And those were the conditions that he was to follow. Come November, way before the redisposition hearing, the court added yet another condition, and that was the no contact with females under the age of 18. So for the next several months until redisposition, he followed that condition as well. So for about 10 months, he continued to comply with conditions of supervised release. And yet the court, we suspect because this court vacated the sentence in its entirety, felt that since the new sentence had not been reimposed, that none of that time, despite the fact that he was reporting, despite the fact that the same conditions everybody else on supervised release were following, that he should not get credit for any of that time. But the Johnson case, the Barresi case, and the Lomanac case all say that supervised release begins when somebody leaves custody. Furthermore, Lomanac says that it may be a violation of due process not to give credit for any of that time. Because when Minnick first pled in the drug case, he was advised that his supervised release term would be no more than five years. So by not giving credit for the 10 months, Minnick was violating the maximum term of supervised release. And then imposing five years of supervised release from the date of redisposition, in essence, it is violating the maximum term of supervised release he can serve. You would argue the maximum supervised release that's left is minus 10 months. Five years minus 10 months. Correct. Correct. So that is how we would go ahead and respond to the issue of the credit on supervised release. I want to go back to the question about the time. I certainly do so. That's fine. Thank you. We'll hear from the government. May it please the Court. I'm Sandra Hanson, Assistant United States Attorney for the District of Arizona. If I could begin by answering a question from the bench that was asked of Ms. Williams. The question was with regard to the footnote in one of Judge Rohl's orders. I note that pages 301 and 302 of the excerpt of record that was submitted by the defendant are reports, sexual offender therapy progress reports from January of 2011. And I'm going to ask Ms. Williams to read the report from January of 2001 and february of 2001. Which state, and I quote, polygraph status. Mr. Minich completed a confirmation polygraph on January 4th, 2001 with Floyd Lawrence. Results indicated he answered relevant questions truthfully when responding no to questions regarding masturbating to fantasies of minors the past three years and contact with any known minor. The past three years ending 2001. Yes. All right. So this is nothing new. Correct. Okay. And when the actual report of the polygrapher is reviewed, from Floyd Lawrence, which is found in the record from pages 314 to 317, it reflects that initially the defendant did show as deceptive to the four questions, which were, as an adult, and other than the two minors you have told me about, do you remember sexually touching any other minor child? Two, as an adult, have you masturbated to sexual thoughts or fantasies regarding minor children? Three, have you used force while engaging in any other sexual contact? And four, in the past 20 years, have you had sexual contact with any minor child? To each of these questions, the defendant replied no and produced scores indicative to deception. In a post-interview test, the defendant stated that he was having problems with those two questions primarily because up until he was approximately 40 years old, he drank frequently and picked up young females. Some of them could have been as young as 16. He never asked their ages and was not sure how old they were. He advised that it was very possible that some of them were minors. There have also been occasions when he thought about sexual interaction with younger females and masturbated. The questions were then rephrased to read, in the past 20 years, have you masturbated to sexual fantasies regarding minors? And within the past 20 years, have you had sexual contact with a person you knew was a minor? The defendant, according to the report, was truthful with regard to no responses. And that's found at page 317 of the record. Thank you, counsel. Before you go on with your argument, I'm really kind of baffled by this case. Aren't we dealing with a marijuana distribution conviction here? Isn't that the underlying conviction? Yes, it is. Was he ever prosecuted for any sex crime? By the federal government? By the federal government? No, Your Honor, he was not. Why are we involved in all of this other stuff? Because when the purposes of supervised release are examined, Congress has said that we look to the history of the defendant as well as the prior crime, and we look to the purposes of rehabilitation, of protection of the community, and of deterrence. And I think that when we look at the entire record, what we can say is that the defendant's criminal history actually began in 1961 when he engaged in sexual conduct with a 15-year-old. And what does the record show in terms of his last conviction for a sex-related crime? His last conviction for a sexually related crime was the January 23, 1981, incident where he was convicted. That's 23 years ago. Is that correct, 23 years ago? Yes, Your Honor. And one of the pieces of information that the district court had was the testimony of Dr. Gray with regard to studies. There's a Prensky study that's cited in the record which reflects that sex offenders who are dealing with extra-familial victims who have a level of sophistication have been followed for a 25-year period. We're not at 25 years yet. And there are still sex offenders who are acting out 25 years later. What's the date of that study? The Prensky study, the first one I believe was done in 1981. I don't know. Off the top of my head, I don't know, but I could provide that at any moment. Was it after the date of our remand in this case, first time around? No, Your Honor. It was before. Additionally, the other kinds of new information that the court had is it had the ---- Incidentally, who is sort of the moving party on this? Is this the government's position or the government's motion to add all of these conditions that are related to sexual conduct? Absolutely, Your Honor. It is certainly true that an earlier assistant United States attorney did not recognize the need for the evaluation or to go forward with the protection of the community and the other kinds of safeguards that can be provided, but it was absolutely clearly the position of the United States Attorney's Office that these conditions should be sought. And was it the position of the U.S. Attorney's Office after remand, and did your district judge decide to reinstate, or was this somehow initiated by the district judge? How did this happen after remand? Initially, the matter was set for a status conference. Another assistant United States Attorney, Mr. Kern, appeared. I told him that I would be assisting him in the matter. He said that was fine. He got off the case. I got on the case. So in that sense, we were going forward with the idea that as a general rule, when a matter is remanded for resentencing, it is done so on an open record. I see. So you interpreted our remand as allowing the district judge to reimpose the same conditions, even in the absence of facts after the initial sentencing? I would say not in the absence of facts after sentencing. Well, the only facts that are facts that were prior to the initial sentencing, we had further testimony about those facts. But as far as I can tell, we have no new information about facts that happened afterwards, things that Mr. Minnick did or things that happened to Mr. Minnick. Can I say that there is any evidence that Mr. Minnick or TM acted out sexually inappropriately after the federal conviction? No. But what I can tell the court is that the district court had more information about the nature of the 1981 conviction. For example, it was not known before that the defendant slapped and smacked the victim, that when she began crying in the motel room, he hit her. He told her to be quiet. He told her that the walls were thin, that he, although there is some evidence in the record that the defendant told her that he wanted her to touch his penis. When she said no, he then offered to pay her a $1,000 fine. He then offered to pay her $2. That kind of information wasn't in there. And I think that what's different is that in this case, at this time around, the court had the opportunity of a treating sex offender therapist who has been in the profession for well over 20 years, who developed the sex offender treatment program for the Arizona Department of Corrections, who could come in, who could look at the records, who could evaluate them and explain to the court why Mr. Minnick or TM still poses a risk to the community. In the language of the prior opinion in our remand, that you argue gives to the district court the justification for gathering further information on, I'll call them old events. When the district court says that sex offender conditions based on a 20-year-old conviction without more do not justify, and I believe that the district court is not considering a case that is a 20-year-old conviction but a 23-year-old conviction, that's not a conviction, that's not a conviction, but not a conviction, that's an additional testimony. When you say 20-year-old conviction, is that the 81? Yes, Your Honor. I'm thinking of the kind of case we get on appeal all the time, a sentencing case. And we say, on reviewing this case, we find that the district court is then free to say, well, you know, I really think, the more I think about that obstruction of justice, the more I really think that he did obstruct justice, and so I'm going to put another, I'm going to put it back in and maybe give some additional reasons, having to do with whatever it was that caused him to put an obstruction of justice adjustment in the first place. We're going to be having a lot of extra work on both the district and circuit court levels, if that's really what our reversals mean. I believe that what sets this case apart is that the district court never had the opportunity to fully develop a record on the issue of remand. Why not in the first sentencing that was appealed here, there were objections made to the sex offender conditions. And at that time, no testimony was taken, so the record wasn't fully developed. Well, I suppose you can always add more, but... I was going to say, what can you point to that is new since the remand? I haven't heard anything new so far. Well, let's take a second look, even if that was permitted. A second look at the evidence demonstrates that Mr. Minnick is still sexually attracted to pre-adolescent children, girls who are just beginning to develop secondary sexual characteristics. What is the evidence of that that was not available when we remanded? The testimony of Dr. Stephen Gray, as well as his former treating therapist, Thomas Romero, who both talked about how the defendant did in treatment. And I think that in some ways having the reports and a cold record is not dissimilar from going to a doctor, having medical tests taken, and only having the results to look at, without the interpretation by other treating experts in the area. The benefit that Judge Roll had this time was the testimony of Dr. Gray when he was asked specific questions. For example, with regard to the imposition of the ban on pornography and sexually explicit or sexually stimulating materials. Dr. Gray explained that possession and masturbation to pornography is seen generally as a precursor to acting out. That pornography, as is cited in his testimony, is the antithesis of what an offender learns in treatment, because it objectifies the person with whom the contact is being engaged. And so I think that that's one of the things that's different, is the explanation of why. And I think that's something that may look absurd based on a 20-year break. Is there anything in Dr. Gray's report that refers to activity or testing or anything that occurred after a remand? No, because the defendant's position at that time was that he was not going to cooperate. And that... So Dr. Gray, in effect, was looking at information which predated the remand in this case, and presumably predated even the appeal in this case. Yes, and in large part, Dr. Gray was deprived of the opportunity for that additional information, because the defendant chose not to cooperate. And the reason he couldn't have done it on the first time around? I'm sorry, Your Honor. What is the reason why this study couldn't or this report couldn't have been generated when the defendant was in front of the district court the first time, at the time, for example, of the original sentencing on the marijuana conviction? Well, and the district court was concerned when he sentenced the defendant for the marijuana conviction, and indicated that he was very troubled by the conviction from 1981. And at that time, the district court was not aware of the 1961 arrest and charge for having sex with a 15-year-old girl, those charges which were ultimately dismissed when the defendant agreed... Right? It is indeed. And when we look at this defendant's entire history, what we see is in 1961, he was arrested and charged with having sex with a 15-year-old girl, agreed to go to the state hospital in Indiana, the charges were dismissed. Two years later, he commits another felony offense. He violates the Dyer Act, and although it's a transportation of a car, he does 18 months in prison. Then there is a gap. In 1981, he assaults and abducts a girl, takes her to a store, takes her to a motel room, photographs her, penetrates her, and uses grooming behavior, in that he tells the girl in the van, would you like to have some wine or some whiskey, would you like a cigarette? And when she says no, he says, I know another 8-year-old girl who has done this. So that's lowering the inhibitions. And this, I believe, goes into Dr. Gray's testimony, the new evidence, which shows not only the level of sophistication, but also the level of sophistication. The time that I would think new material would be required would be after the sentencing that was appealed to us previously, and that was the sentencing upon revocation of supervised release on the conviction for marijuana. That's my understanding. And that's the first time that the defendant has imposed the sexual offender conditions for the first time over objection? Yes. And when was that done? Was that after he and his friend were stopped trying to go into Canada? Was that the first time that these conditions were imposed? The district court, at the time of the initial sentencing on January 5, 1988, states that he is troubled by the defendant's conviction. I think the answer to my question is yes. That is to say, these sex offender conditions that we vacated were first imposed after he violated probation by trying to get into Canada. Is that right? What year would that be, if you could find it? As I recall the record, on January 5, 1998, the defendant was sentenced. And I believe during that proceeding, the district court ruled that the defendant was convicted. And the district court makes reference to the defendant's criminal history, and is troubled by that. And I believe at that point imposed mental health counseling, which I believe he thought would have encompassed psychosexual assessment. If I understand the chronology, what happens is that they try to get into Canada. That's a violation of the conditions of probation that resulted from the marijuana conviction. He gets a sentence with some sex offender restrictions that were not objected to, and it wasn't appealed. Then his motel or apartment or something is later raided, and he's associating with a felon, and he has the pornographic video covered. And an unused throwaway camera. And then it's revoked, and then the conditions are reimposed over objection, and then that's what was appealed to us the first time. Yes, Your Honor. I guess, and then our mandate referred to that sentencing. And it seems to me that if there's any reason to deviate from our mandate, that reason would have to have something to do with the activity of the defendant. And it would have to have something to do with the activities or conduct of the defendant after that sentencing. That would be, what, five, six years, the last six years. From the time of sentencing, yes, he was sentenced in 1988. The first time it was objected to was, I think, 2002. Yes. 1988 or 1998? I'm sorry, Your Honor, I think I did say 1988. I meant 1998. 1998 was the original sentencing, was it not? Yes, Your Honor. January 5th of 1998. The second time he was sentenced to these conditions to which he's now objecting was 2002, and that was the first time he objected to the conditions, correct? Yes, Your Honor. And I submit that when we look at the defendant's entire criminal history and we see from his 1981 conviction for sexually molesting the 8-year-old girl, where he was allowed to go into a treatment program, he absconded a few months later, his probation was revoked, and he ended up doing 18 months. In 1985, he had three other convictions for passing fad checks on three separate occasions. And he continued on his criminal activity in 1993 when he rented a truck which was used for marijuana trafficking. And then in January of 1994, he delivered $103,000 in United States currency, knowing it was involved in a drug trafficking. Well, he needs to find another line of work, but most of those don't go to sexual... No, they don't, Your Honor. But when you look at the defendant's criminal history, when you listen to what or when you review the transcript of the testimony of Dr. Gray, and you take it all into account, here's a defendant who is not a treated sex offender. As the witness testified, there's no evidence that he's cured, number one. There's no evidence that he's self-treated, number two, that he still presents as being sexually interested in pre-adolescent girls between the ages of 8 and 10. Can I say that there's no risk that he's going to re-offend? Absolutely not. Did Dr. Gray characterize it as a low to moderate risk to re-offend? Absolutely he did. And is that risk to the community, to other 8 to 10-year-old girls, worth not having the additional safety net of a condition of supervised release? Well, before you... Excuse me. Before you... Maybe we're about to say the same thing. I wonder if you had a word about the supervised release credit. In terms of the length of the supervised release? Yes. Do you object if we suggested that at least 10 months be reduced from the 60 months, based on his existing supervised release? What I would say, Your Honor, is that the district court believed that the defendant had not been sentenced and there were minimum conditions. And if the purpose of supervised release is to see that a defendant is receiving the kinds of services and treatment and correctional matters, then the supervised release was basically... But his premise may be about to disappear. That is to say, the conditions that he thought quite important and therefore he couldn't get credit for, they may be about to disappear again. So even if he's right, which I'm not sure, his premise is gone. That was my understanding of the district court's comments were, well, yeah, but you haven't been subject to the important sex offender conditions. And it seems to me that if you lose on the merits of that... Then I lose 10 months. Then there's very little left to support the denial of credit. I would agree. Is there any showing that within that 10-month period there was any violation of those conditions, assuming they were still on? The conditions were bare minimum reporting once a month? No, there's no allegation that he has done any new criminal conduct or that he has failed to report as having been directed. My question was, is there any showing that assuming those conditions were effective during that 10 months, were there any violations of those? Obviously, they weren't effective, and we understand your argument, but the question is, is there any showing in the record that notwithstanding the absence of those conditions, he conducted himself in such a way as he would have violated them if they were? No, Your Honor, the record does not reflect that. Well, sure, he wouldn't have complied with the requirement of treatment. Wasn't there a requirement? Of mental health treatment? Of subjecting himself to sex offender treatment? No, Judge Rohl did not impose that. He stayed in position in that condition until being subjected. Thank you, counsel. Ms. Williams, you have some reserve time. Thank you. Ms. Hanson brought up the issue that Mr. Minnick in the polygraph report told the polygrapher that up until he was about 40 years old, he had a drinking problem, and during that time period, he may have picked up children who were minors and had thoughts about them. Mr. Minnick is now 69 years old. So that means that happened in the 1970s, before the 1981 offense. The court also asked about new information, especially in the form of studies. Certainly the probation officer in her dispositional memorandum talked about a great many studies, including the Prensky study. And a part of the evidence you're hearing, an argument in this case, became the battle of the studies. You can interpret studies to suit whatever is in your case. You can say that it means Minnick will reoffend, that he stands a great chance of reoffending, or that he stands next to no chance of reoffending. In fact, Dr. Gray on the stand said that he recalled a study that said after 25 to 30 years, if somebody had not reoffended sexually, there was a 1% or less chance of reoffending in that regard. DOJ came out with a study following sex offenders since 1994. The study came out in November of last year and said that actually their estimations of recidivism among sexual offenders was much lower than they had previously predicted. Mr. Hansen, who's up in Canada, also has come out with some new studies that shows the same thing. So Ms. Hansen talked about the sophistication of the offense. Dr. Gray also talked about it. But when we cross-examined him, we got him to confess that while Minnick went out, saw an 8-year-old girl walking along the road and picked her up, if he had been sophisticated, he wouldn't have needed to go by the Kmart and buy a camera or buy clothing for the girl as a sort of a bribe. He would have been much more sophisticated and prepared and thought this well out in advance, and that's an indication that it really was more spur of the moment and a very unsophisticated offense. And we are dealing now with a man who's almost 70 years old, and the realities of life are that that kind of interest may decrease and likely has decreased with somebody like Mr. Minnick. The 1981 conviction, Dr. Gray, even though the government had the records now, including police reports of the 1981 conviction, Dr. Gray was not given those records to review before his testimony. He did not have that information before he testified, and that is in the record as well, even though the court itself was given copies of those records. And while they provide additional information about the offense, from back at the initial PSR in this case, the PSR assumed the worst, that there was penetration, that certainly there was kidnapping and bringing to a hotel room, isolated from anyone, that this was a stranger abduction. I mean, even though there may have been a slapping, an offer of alcohol, and those are ugly facts for sure, but they don't make a difference in saying that this defendant is more likely to reoffend. And in fact, when Dr. Gray was questioned, after all the quibbling, you know, was there penetration or was there a touching or was it just on the buttocks and the thighs, Dr. Gray said, you know, it wouldn't matter in terms of treatment, and it didn't matter in terms of his evaluation of the medium to low risk to reoffend. So these kinds of minuscule facts do not change the ultimate conclusion of the doctor in this case. It is not true that Mr. Minnick did not cooperate with regard to being retested. The court never ordered Mr. Minnick to undergo an additional psychosexual evaluation. What he did say, when probation wanted him to sign authorizations for the release of the records as they related to the 1961 allegation and the treatment he participated in after that, he refused to sign those authorizations on counsel's advice, and the court eventually found that he did not have to do so. Dr. Gray said that without a reevaluation, he could not say at what level Mr. Minnick was then when disposition happened earlier this year, at risk to reoffend. He did concede that without any offenses in the past 20 years, that it is quite possible that Minnick has successfully self-treated. And he said that, again, it didn't matter whether or not all the things that he wanted Minnick to say, yes, there was penetration, did not matter in terms of the type of treatment that he would be recommending for him. Counsel, what does the record tell us about who retained Dr. Gray for this evaluation? Dr. Gray, as my understanding, is on the list of approved psychosexual evaluators that probation uses. And he also had up until when the switch happened from Dr. Gray to Thomas Romero, he had had the contract with probation up in Phoenix to go ahead and do treatment as well. So he was asked to do this evaluation by the probation staff. Is that right? It was the district court who ordered the psychosexual evaluation. It was probation who made the arrangements with it to happen with Dr. Gray. The sentencing history in this case was Minnick was eventually put on probation. He violated. He was on probation again. Then the incident with Mr. Hrdlicka going into Canada occurred. He was under revocation of probation. The psychosexual evaluation was ordered. He was continued again on probation, but now with sex offender types of conditions, which were not objected to back at that sentencing. He violated again with just exactly the circumstances that the court has described. And now the probation revocation happened. His probation was revoked. The 24 months plus supervised release with sex offender conditions happened. No additional psychosexual evaluation happened in between that time. However, that's when the polygraph happened. That's when the plethysmograph happened. And that's with the reports that Thomas Romero generated all occurred. It was before the actual revocation there. And I'm out of time, unless there's something else. Thank you, counsel. The case just argued will be submitted for decision and the court will adjourn.
judges: Canby, O'scannlain, W. Fletcher